**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| Debra Wilder, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| v. | )     No. 14 CV 50370 |
| | )     Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|        Defendant. | ) |

**<u>ORDER</u>**

Plaintiff Debra Wilder brings this action under 42 U.S.C. §405(g), challenging the denial

of social security disability benefits. She argues that the case should be remanded because the

administrative law judge ("ALJ") overlooked a significant piece of evidence, the records

describing 17 therapy sessions plaintiff had in 2010 with a social worker named Sheila Housler-

Grady. Plaintiff initially sought therapy to deal with grief from her husband's suicide in 2008,

but the sessions roved over a wide range of problems, with plaintiff espousing conspiracy

theories about conflicts in her life. According to plaintiff (more accurately, her attorney), reading

these counseling records is "comparable to watching a horror movie." Plaintiff argues that these

records along with other evidence show that she was disabled under either Listing 12.06

(anxiety-related disorders) or 12.08 (personality disorders). Her argument for remand rests on the

basic rule that an ALJ "may not ignore entire lines of evidence." *Arnett v. Astrue*, 676 F.3d 586,

592 (7th Cir.2012). The Court agrees with this argument.

Plaintiff, who applied for disability benefits before, filed her applications this time on

September 7, 2011. This appears to have been on her 50th birthday. Although she alleged

physical impairments, her present appeal focuses only on the psychological impairments. The

ALJ first found that plaintiff had the severe impairments of depression, anxiety, post-traumatic

stress disorder, and somatoform disorder, although the ALJ provided no explanation for these

conclusions. In the rest of the opinion, the ALJ found that the impairments had minimal impact

on plaintiff's daily life and ability to work.

The ALJ referred to the Housler-Grady treatment records only a few times in the opinion.

The only arguably substantive discussion was the following:

> In addition to the degenerative disc disease and neuropathy, the claimant has
> depression, anxiety, post-traumatic stress, and somatoform disorders. The claimant
> had counseling with a social worker from February 3, 2010 through November 2,
> 2010, about nine months total, to address bereavement following the death of her
> husband. Her husband, the wage earner, whom the claimant took care of for eight
> years, committed suicide after a long battle with a schizophrenic/delusional type
> illness (Exhibit B8F).

R. 14. The Court agrees with plaintiff that this discussion was perfunctory and glossed over the

relevant issues.

This discussion contains no actual "analysis." Only a few snippets of information are

conveyed. One is the length of the treatment relationship. The other is that the counseling

generally involved "bereavement." These statements are terse and arguably misleading.

Although the ALJ accurately stated that the relationship covered nine months, this description

leaves out that it was extensive, consisting of 17, one-hour therapy sessions. Ms. Housler-Grady

thus had a longitudinal picture of plaintiff's condition. It was not a snapshot. Referring to the

relationship as "bereavement" counseling, with no further details provided, creates the

impression that it was a time-limited and fairly normal type of grief counseling following a

spouse's death. However, a closer reading of these notes, as described below, suggests that

plaintiff's problems went beyond grief counseling and arguably were the result of permanent

mental impairments. The ALJ's bland summary sanitizes the darker underlying picture presented by these notes, raising a question of whether the ALJ read them.

For each of the 17 sessions, Ms. Housler-Grady prepared a detailed summary of what plaintiff discussed and also included brief commentary and analysis. There are over 30 pages of notes. Ex. 8F. In this Court's view and to Ms. Housler-Grady's credit, the summaries of each session are clear, thorough, objective, and professional.[1] At the same time, they collectively tell a vivid story of plaintiff's day-to-day troubles and mental states.

This story is the centerpiece of plaintiff's argument for remand. Her two briefs are largely a greatest hits recitation of the disturbing or odd statements plaintiff made. It is fair to say that she was suspicious of others and prone to believe in conspiracies. For example, although her husband's suicide took place over a year before she began therapy, plaintiff was still heavily focused on her husband's remains and specifically her belief that the clean-up crews left body "particles" (her husband killed himself in the bathroom using a shotgun) which supposedly caused the pipes to freeze over, and that the Coroner was covering up these issues. Dkt. #18 at 3; R. 421, 424. Plaintiff described having paranormal premonitions; seeing poltergeists, ghosts, and spirits in her house and other places; hearing strange voices. She claimed to have taken pictures of the spirits. R. 424. She speculated that she may have been adopted or that the insurance man may have been her father, speculations based on her claim of having two birth certificates; she worried that her brother (who was living with her) was trying to manipulate her husband's death; she discussed her belief that the U.S. Government had possibly done something to her husband while he was in the Navy; she believed that her telephone was being tapped; she worried that gas was mysteriously disappearing from her riding lawnmower; she stated that she was awakened

[1] Ms. Housler-Grady viewed her role as providing a supportive environment, and she endeavored to keep an open mind, telling herself after one of the early sessions: "Listen carefully to client; do not interpret too soon." R. 423.

with hand marks on her body; she believed her house was "fighting her"; she got in disputes with the contractor, her attorney, and others who were trying to manipulate her; she speculated that the Government was trying to reduce world population through vaccinations; she claimed her sister got pregnant without any ovaries; she was suspicious of her sister trying to buy her house. *Id.* at 4-5, 8-9.

As this summary suggests, many of plaintiff's issues were not related directly to bereavement, but touched on other areas of her life. This fact was noted by Ms. Housler-Grady early on. *See* R. 418 (4/21/10: "No mention of [her husband] or the feelings of loss due to this death. She is focused on the here and now, especially trying to get a settlement from the bio-hazard company that 'cleaned' the site of [her husband's] suicide."). After the first session, Ms. Housler-Grady listed plaintiff's primary problem as "Grief/Loss Unresolved," but added as a secondary problem: "Response to possible paranormal activity." R. 428. Later, Ms. Housler-Grady questioned whether her original diagnosis of bereavement was correct. R. 414.

It is not simply that plaintiff made numerous troubling statements, but also that Ms. Housler-Grady repeatedly interpreted them as evidence of paranoia, and possibly paranoid personality disorder, and identified other symptoms such as mania.[2] Yet, the ALJ simply glossed over these many statements, essentially giving them no weight.

---

[2] The Court relegates the following examples to a footnote not because they are unimportant, but rather because they are abundant. *See* R. 420 (3/23/10: "Loose associations more prominent today. She continues to see others as strange and not very honest."); R. 419 (4/6/10: "She expresses distrust of the coroner's office"); R. 417 (5/27/10: "Client manicy today; speech was rapid and there was flight of ideas. Unsure just what we are dealing with; she initiated services regarding the problems in the house that she states resulted from inadequate clean up after her husband's suicide; she does not focus on him or the suicide."); R. 416 (6/9/10: "Is client experiencing paranoia?"); R. 414 (6/22/10: "She again focuses on rather bizarre things—the birth certificate document; her niece's ability to see the spirits and the dysfunction and alienation in her family of origin. Diagnosis originally given at time of Assessment may not be correct. She made very little mention of [her husband] today. Need to continue to explore history with client as well as the range of symptoms she is experiencing. There is certainly a strain of paranoia evident."); R. 412 (7/21/10: "She has a pattern of distrusting people; does she have a Paranoid Personality Disorder?"); R. 409 (8/19/10: "Client appears more stressed today; flight of ideas and paranoid ideation."); R. 407 (9/20/10: "She is interested in conspiracy theories."); R. 405 (10/4/10: "She does remain suspicious of others

There were several points where these records would seem to be relevant, such as the analysis of the Paragraph B criteria in the Section 12 listings. The ALJ found that plaintiff only had mild limitations in activities of daily living because, although her brother did all the household chores, plaintiff occasionally helped sweep and because plaintiff was able to "drive and occasionally shop." R. 16. Put aside whether these are persuasive reasons, the ALJ did not also consider the possibility that plaintiff's paranoia problems also affected her abilities. As plaintiff asks in her brief: "Why did a person who testified to hearing voices have only mild restrictions in daily activities?" Dkt. #18 at 7. As for the second Paragraph B criteria, social functioning, the ALJ found that plaintiff had no more than mild limitations because she "gets along with her adult children" and "lets her brother live at her house." R. 16. Here again, the Housler-Grady records are at least arguably relevant, as they contain several statements about plaintiff's suspicions of her brother. *See, e.g.* R. 418 ("She continues to experience frustration with her brother who is living with her."). The Court's focus now is not on reaching a definitive conclusion about whether plaintiff is disabled, but merely on assessing whether the ALJ considered this evidence fully and provided a coherent explanation for her conclusions. The Court concludes that she did not.

In its response brief, the Government claims that the ALJ "expressly discussed" the claims of paranoia and personality disorder. Dkt. #25 at 6. This assertion is simply not true. The ALJ never used the word "paranoia" or the phrase "personality disorder" anywhere in the opinion. It is true, as the Government argues, that the ALJ briefly noted that plaintiff testified that she sometimes hears voices that wake her up and "sees things that others do not see." R. 15. Although these are perhaps oblique references to paranoia problems, by themselves they are not

_____

motive"); R. 404 (10/18/10: "Possible paranoia; today flight of ideas was very evident."). For whatever reason, despite these many observations, Ms. Housler-Grady never offered a formal diagnosis.

adequate because the ALJ did not include any accompanying analysis. Nor was there any effort made to connect this testimony back to Ms. Housler-Grady's ongoing concern that plaintiff was possibly suffering from paranoid personality disorder.

The Government also points out that the ALJ cited to several other reasons to support the decision, such as the fact that plaintiff was never hospitalized and did not participate in therapy after stopping counseling with Ms. Housler-Grady. Although these assertions are true, they are not directly responsive to the Housler-Grady records and therefore cannot serve as a blanket excuse to ignore them. As noted above, the Court has doubts whether the ALJ even read the Housler-Grady records. For these same reasons, the Court refuses the Government's invitation to affirm under the harmless error doctrine. Dkt. #25 at 9; *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decisions on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time."). At this stage, the issue of plaintiff's possible paranoia-related and other psychological impairments has not been developed sufficiently to allow for any confident judgment. As far as the Court can determine, no expert ever seriously considered the Housler-Grady records or the larger claim that plaintiff had paranoid personality disorder or a related disorder. The Court notes that a psychologist, Thomas Low, completed the Psychiatric Review Technique and found, contrary to the ALJ, that plaintiff had *no medical impairments*. R. 545. In his notes, Dr. Low made a vague reference to the Housler-Grady records: "Mentally [plaintiff] was seen for bereavement in counselling in 2010." R. 557. However, this reference suffers from the same problem discussed above—namely, no analysis. In any event, the ALJ never relied on this opinion.

As for the other medical opinions, none of them addressed this specific issue, nor assessed the Housler-Grady evidence. The ALJ summarized the statements from several doctors—including Dr. Dumpit, Dr. Bach, and Dr. McFadden—who offered observations about whether plaintiff had a possible neurological impairment causing memory problems. But this problem was separate from questions about paranoia and mania. The expert who came the closest to addressing these issues was psychologist Shaun Bong who interviewed plaintiff, administered numerous psychological tests (such as MMPI-2), and issued a report. Ex. 5F. If anything, Dr. Bong's report supports plaintiff. The ALJ at least acknowledged this report, stating among other things that Dr. Bong concluded that plaintiff had "prominent mood symptoms, personality factors (somatic thinking), post-traumatic stress (husband's death, car accident) and features of a somatoform disorder." R. 15. However, the ALJ seemed to give this report no weight, and it is not entirely clear why. Moreover, in summarizing this report in a lengthy paragraph, the ALJ omitted an important conclusion, one strongly favorable to plaintiff. It is this: "Given the prominent role that personality factors and mood symptoms are impinging on the patient's cognition, physical well-being, and reduced level of functioning, [plaintiff] is not capable of gainful employment at this time." R. 390.

The above reasons are sufficient to justify a remand. The ALJ should consider calling an impartial medical expert or ordering another psychological consultative examination. Plaintiff's motion for summary judgment is granted, the Government's motion is denied, and this case is remanded for further consideration consistent with this opinion.

Date: July 21, 2016          By:  _____
                                  Iain D. Johnston
                                  United States Magistrate Judge